## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 06 2020, 9:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Katharine Vanost Jones
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of:

D.B., M.S., D.S. *(Minor Children),*

and

L.B. *(Mother)*,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner,*

May 6, 2020

Court of Appeals Case No. 19A-JT-2420

Appeal from the Vanderburgh Superior Court

The Honorable Renee Allen Ferguson, Magistrate

Trial Court Cause Nos.
82D04-1901-JT-164
82D04-1901-JT-165
82D04-1903-JT-609

**Robb, Judge.**

# Case Summary and Issue

[1] L.B. ("Mother") appeals the termination of her parental rights to three of her children and presents the sole issue of whether the juvenile court's order terminating her parental rights was clearly erroneous. Concluding it was not, we affirm.

# Facts and Procedural History

[2] Mother has four biological children, three of whom are the subject of this appeal: D.B.,[1] born December 28, 2004; D.S., born September 21, 2010; and M.S., born July 21, 2012 (collectively "Children"). R.S. is the biological father of D.B., and W.S. is the biological father of D.S. and M.S.[2]

[3] On November 13, 2017, the Department of Child Services ("DCS") received a report alleging that Mother was asleep and unresponsive, and Children got themselves up for school and missed the school bus. On November 14, a DCS family case manager ("FCM") visited the home and Mother eventually admitted she had used methamphetamine the day before and multiple times over the last few weeks. Children were removed immediately and placed with

---

[1] In their briefs, both parties refer to this child as "Dra.S." or "Dr.S." However, the initials of this child's name provided in the record and on the juvenile court's termination order are "D.B." As such, we refer to this child as "D.B." throughout this opinion. In addition, we note that the State incorrectly identifies Mother's initials as "M.C." when the correct initials are "L.B."

[2] Ultimately, both fathers voluntarily relinquished their parental rights to their respective children and do not participate in this appeal. Therefore, we have limited our recitation of the facts to those pertaining to Mother.

their maternal aunt. On November 16, DCS filed separate petitions alleging the Children were children in need of services ("CHINS") due to Mother's substance abuse issues. Before the initial hearing, a court appointed special advocate ("CASA") for Children was named. The juvenile court held an initial/detention hearing on November 21 during which the juvenile court entered a denial on Mother's behalf. Mother began taking drug screens on November 28.

[4] The juvenile court adjudicated Children CHINS on December 5. Following a hearing on January 2, 2018, the juvenile court entered a dispositional order requiring Mother to (among other things): complete a substance abuse assessment and all recommended treatment; refrain from drug and alcohol use; submit to random drug screens; participate in Parent Aide services and the Parents Drug Court program; obtain and maintain stable housing and income; timely enroll in any programs recommended by service providers; and attend visitation with Children. Mother completed the substance abuse evaluation, which recommended treatment. Mother was accepted into the Parents Drug Court program and met with the parent aide, who would help with housing, once. Mother did not follow through with the treatment recommendations.

[5] From November 2017 through January 2018, Mother submitted to random drug screens but had only one clean screen; most of the screens were positive or dilute. On January 17, Mother failed to appear for a Parents Drug Court drug hearing and the juvenile court issued a writ of attachment for Mother's arrest. Around the same time, Mother ceased all contact with DCS and disappeared.

The FCM and parent aide both tried to contact Mother but were unable to locate her. In March, Mother was discharged from the Parents Drug Court program for non-attendance.

[6] In May, Mother was still non-compliant and unable to be located. Parent aide services and Mother's substance abuse treatment referral were closed out or canceled due to her non-attendance. Following a review hearing on May 22, the juvenile court issued an order finding that Mother has not participated in any services since mid-January 2018: she had not attended visitation, submitted to drug screens, completed substance abuse treatment, or participated in the Parents Drug Court since that time. Several days later, Children were placed with their maternal grandfather and step-grandmother. The FCM continued to call Mother and leave her voicemails. On July 27, the FCM received a voicemail from Mother, called her back, and left another voicemail as Mother did not answer.

[7] In October, the FCM learned that Mother was employed at a local bar; she called the bar and spoke with Mother. The two discussed the case, the steps Mother would need to take toward reunification with Children, and that she had an active writ she needed to address. Days later, Mother was arrested on the active warrant. Following her arrest, the juvenile court held a hearing on October 23 and later issued an order finding that Mother had been non-compliant with services and admitted to using methamphetamine and marijuana as recently as three weeks prior. Mother resumed submitting to random drug screens.

[8] Around the same time, DCS placed D.S. and M.S. in foster care at their grandfather's request due to M.S.'s behavior issues. D.B. remained with his grandfather until June 2019 when he was placed in the same foster home with his siblings. In a November 3 permanency report[3] filed with the juvenile court, DCS reported that Mother had been non-compliant with her parent aide services, random drug screens, substance abuse evaluation, and recommended services. DCS further reported that since locating Mother early in October, she missed drug screens on October 17, 19, 22, and 25, and she screened positive for alcohol on October 29. *See* Exhibits, Volume I at 85.

[9] Mother participated in a team meeting on November 9 with the FCM, DCS supervisor, and CASA to discuss the steps Mother needed to take to be reunited with Children. At that point, Mother had submitted to some drug screens but was not fully compliant as she had also missed several screens. On November 20, the juvenile court held a permanency hearing and subsequently entered an order approving Children's permanency plan of reunification with a concurrent plan of adoption.

[10] At the time, Mother was living with her boyfriend, W.D.[4] The two were scheduled to attend a meeting on November 26 to discuss Mother's progress with services and whether W.D. would also participate in services. Mother

---

[3] This report covered the period of May 23, 2018 to November 1, 2018.

[4] Although the juvenile court refers to W.D. as Mother's fiancé, Mother refers to W.D. as her boyfriend in her appellate brief. Therefore, we refer to W.D. as Mother's boyfriend in this opinion.

showed up to the meeting forty-five minutes late without W.D. During the meeting, Mother stated she was doing better but later admitted she and W.D. had used methamphetamine that morning. After the meeting, the FCM tried to contact Mother but kept getting a message that Mother's phone was unable to accept calls.

[11] Mother completed another substance abuse assessment on December 6 at Stepping Stone, which recommended she attend the Matrix program – group and individual counseling sessions for twenty-four weeks focusing on coping mechanisms for substance abuse. Mother attended the Matrix orientation on December 10 but then dropped out of treatment and did not attend any further appointments. Stepping Stone sent Mother a letter outlining the failed appointment policy and stating that she needed to meet with a manager on January 8, 2019. However, Mother did not respond and eventually, services were closed due to non-compliance. *Id.*, Vol. III at 12.

[12] Between December 2018 and January 2019, Mother did not submit to any drug screens. The next time the FCM spoke with Mother was at some sort of criminal hearing for W.D. At that time, the FCM informed Mother she would be filing a petition to terminate her parental rights. In response, Mother "stated that she hated to admit it but the kids might be better off because she was not in a good place at this time." Transcript, Volume II at 63. On January 28, 2019, DCS filed Verified Petitions for the Involuntary Termination of Parent-Child Relationship between Mother and D.S. and M.S. DCS later filed a petition to terminate Mother's parental rights to D.B. on March 29. At a hearing in

February, Mother agreed to resume services and DCS put in a new referral for drug screens beginning in March. Mother was inconsistent in submitting to screens.

[13] On April 8, DCS filed a progress report detailing Mother's non-compliance with the dispositional order: Stepping Stone discontinued Mother's services on January 8, 2019; after Mother's random drug screen referral was renewed on February 20, 2019, she missed screens on March 8 and 14; and she has not been participating in visitation due to her lack of contact with DCS and non-compliance with drug screens. In another report, DCS indicated that since November 21, 2018, Mother failed to call or appear for drug screens seventy-four percent of the time. *See* Exhibits, Vol. 1 at 126. Sometime around April or May, Mother was charged with driving under the influence of alcohol in Kentucky and completed a seven-week substance abuse program in order to have the charge reduced or diverted.

[14] The juvenile court held a fact-finding hearing on April 23, 2019 and June 16-17, 2019. At the time of trial, Mother was employed and living in Tennessee with W.D. and his parents. On September 24, the juvenile court entered three separate orders[5] terminating Mother's parental rights to Children and found, in pertinent part and including the findings that Mother challenges:

---

[5] Indiana Appellate Rule 38(A) provides that "[w]hen two (2) or more actions have been consolidated for trial or hearing in the trial court, they shall remain consolidated on appeal." Here, DCS filed three separate

13.    Mother was ordered to establish and maintain stable housing and income [but] has failed to do so as of the time of trial.

14.    Mother currently resides with her fiancé, [W.D.], and [his] parents in Tennessee. Mother has resided there since approximately May or June 2019. [W.D.] is a methamphetamine addict who Mother admitted using methamphetamine with on multiple occasions throughout the underlying CHINS matter. [W.D.] has been convicted of Possession of Methamphetamine in Vanderburgh County, IN and currently has a writ issued for his arrest due to violating his probation. Prior to that, [W.D.] was convicted of Driving under the Influence in two separate counties in 2012 and 2014. [W.D.] additionally has pending Auto Theft charges in Dubois County, IN.

* * *

16.    Mother additionally has not maintained stable income. Mother had a variety of employment since [Children's] removal. Mother additionally was unemployed for approximately four (4) months from December 2018 to March 2019. Mother currently is employed by a rehabilitation center in Dixon, Tennessee. However, Mother has only been employed by her current employer for approximately six (6) weeks prior [to] the trial. Additionally, while Mother reports that she is financially stable, Mother's most recent bank statement shows a negative balance prior to a deposit. The Court finds that Mother's assertion regarding her financial stability is less than credible, especially

termination petitions and the juvenile court entered three separate termination orders. Because the juvenile court held a consolidated fact-finding hearing on all three petitions, the three actions remain consolidated on appeal.

given that Mother reported she and [W.D.] are supposed to be saving money to buy a home.

17.     Mother additionally was ordered to comply with multiple services as part of the Dispositional Decree in the underlying CHINS.  However, Mother did not manage to substantially comply with a single one of those services.  Mother testified that she understood that completion of services was necessary in order for her to get [Children] back into her care.

* * *

19.     During the contact with Mother in October 2018, DCS and CASA discussed with Mother the importance of re-engaging with services.  Mother was informed that visitation would be reinstated with [Children] if Mother re-enrolled in services and began to participate in the case.  A meeting was held on November 26, 2018 to address services with Mother and [W.D.].  [W.D.] failed to attend the meeting or to be involved in the CHINS matter in any way.  DCS and CASA discussed housing options with Mother, in addition to her non-compliance[.]  Mother was offered services and resources to combat these issues, but failed to take advantage of anything offered to her.

20.     Mother then again went missing and stopped contacting the DCS between November 2018 and January 2019, at which time the DCS filed to terminate Mother's parental rights.  Mother's contact with the DCS and her compliance with services failed to improve after the filing to terminate her parental rights.  Mother continued to fail to make any progress towards having [Children] returned to her care, nor did she show an inclination to make progress.

21.     DCS and CASA attempted to address Mother's non-compliance with services to address her substance abuse and

instability in January 2019, as well. Mother's compliance still did not substantially improve. Mother admitted in January 2019 that [Children] may be better off in someone else's care.

* * *

24. At trial, Mother disclosed a history of substance abuse, including methamphetamine, marijuana, Suboxone, and other opiates. Mother has used illegal substances since the age of fifteen (15). Mother admitted at trial that she has abused methamphetamine [for] approximately two (2) years. However, Mother's first Substance Abuse Evaluation from Southwestern Behavioral Health identifies the Mother's first use of methamphetamine was at age sixteen (16). When Mother attempted to stop using illegal or non-prescribed substances, she began to abuse alcohol. During the pendency of the underlying CHINS and after the filing of this termination cause, Mother incurred a criminal charge for Driving Under the Influence in Kentucky, in or about May or June 2019. Despite this and Mother's previous history of replacing other substances with alcohol, Mother does not believe that her consumption of alcohol is an issue.

25. Mother failed to maintain sobriety during the pendency of the underlying CHINS matter, despite testifying that she believed children require a sober caregiver and that [Children] deserve a sober caregiver. In addition to continuing to consume alcohol, . . . Mother admitted to relapsing on methamphetamine on multiple occasions throughout the underlying CHINS. Mother continued to use methamphetamine despite being court ordered to maintain her sobriety and despite knowing that maintaining sobriety was one requirement for her to have her [Children] returned to her care. Mother additionally stated that she does not consider herself an addict, despite her long history of addiction and substance abuse. The Court finds that Mother's refusal to acknowledge her addiction indicates she is extremely likely to

continue to abuse substances, including methamphetamine, a known intoxicating and illegal substance.

\* \* \*

29.     As of the time of trial, Mother has only completed a DUI course referred to her through her 2019 Kentucky criminal involvement. Mother only completed the program in order to have the DUI charge reduced or diverted. The program consisted of a total of twenty-one (21) hours of classes. Such a program is woefully insufficient and incomparable to the recommended treatment for Mother in either of her Substance Abuse Evaluations. Mother was not sufficiently motivated by having her [Children] returned to her to complete the more intensive treatment options. The Court finds that Mother's failure to complete an appropriate treatment program and her lack of inclination to complete an appropriate treatment program, places Mother at a high risk of relapse or continued substance abuse in the future.

30.     Mother was also non-compliant with parent aide services [which] were recommended at the time of disposition for Mother due to her instability with housing and income. However, Mother did not participate in the service because she did "not agree" with the parent aide. Mother only met with the parent aide once and the service was ultimately ended due to Mother failing to participate. As of the time of trial, Mother has not maintained a stable home or a stable income during the pendency of the CHINS matter. Mother admitted that she could not offer [Children] any type of stability during the course of the underlying CHINS.

31.     To assist Mother in obtaining her sobriety, she was referred by the DCS and the Court to be evaluated for the CHINS Parent Drug Court program[, which] requires weekly

status hearings with the Court and weekly AA/NA meetings, in addition to substance abuse treatment and random drug screens. Mother did complete her evaluation and was accepted to the Drug Court program on December 20, 2017. However, Mother struggled from the beginning to attend the required meetings. Mother eventually failed to appear for a Drug Court hearing on January 17, 2018 and a writ of attachment was issued. As stated previously, Mother would go on to be missing in the underlying CHINS matter until approximately October 2018. Mother was taken into custody on the writ of attachment on October 18, 2018, however, by that time, Mother has been unsuccessfully discharged from the Drug Court program in March 2018. Mother admitted that she was not attending treatment or maintaining her sobriety at this time.

32. Mother also failed to participate consistently in random drug screens. Mother participated in a few screens between [Children's] removal and her disappearance in January 2018, with only one (1) screen during that time being clean. Between January 2018 and October 2018, when DCS located Mother for a brief time, Mother did participate in some screens. However, Mother then did not screen consistently after October 29, 2019. Even leading up to the day of this trial, Mother did not attend all available drug screens to demonstrate continuing sobriety until June 2019. Combined with Mother's admissions of continuing methamphetamine use during the course of the underlying CHINS, the Court finds that Mother continued to abuse substances until at least June 2019, leaving only one (1) month of possible sobriety as of the time of trial.

33. Prior to Mother's disappearance, Mother was permitted by the relative placement at the time to visit [Children] whenever she wished. Mother failed to take advantage of such a rare opportunity, instead abandoning [Children] and her parental responsibilities.

34.     Mother has not visited or otherwise had contact with [Children] since January 2018.  She did not send cards or letters.  She did not provide for their support in anyway [sic].  Mother only asked [about Children's] welfare twice (2) during the underlying CHINS.  Mother acknowledges that her abandonment of [Children] impacted [them] negatively.

35.     Mother did resume contact with the DCS in February 2019; however, she continued to fail to cooperate with services to address her sobriety and stability.  Throughout the underlying CHINS cause, Mother never was offered visitation due to her failure to make progress with services or establish stability that would have made visitation safe and healthy for [Children] to attend.

36.     While Mother continued to abuse methamphetamine and to fail to address her addiction, [Children] remained in out-of-home care, and currently [have] continued to absolutely thrive in the foster home, developing a fast bond with the foster parents, in addition to also maintaining a bond with . . . siblings.  [Children have] improved both behaviorally and academically.  The foster placement is willing to adopt [Children].

37.     As of the day of trial, Mother relies on [W.D.] and [his] family for housing.  Mother has only been employed for six (6) weeks and she does not own or rent through a lease [at] her current residence.  Mother's continued stability, at this time, is dependent on her relationship with [W.D.], another methamphetamine addict.  This same relationship has ended on at least two (2) prior occasions and does not leave the Court convinced that its continuation would ensure sufficient stability for [Children].

38.     Additionally, DCS attempted to engage [W.D.] in the underlying CHINS case and to offer services.  However, [he]

never communicated with the DCS or participated in any case meetings with Mother regarding [Children].

Appellant's Appendix, Volume II at 13-20 (footnotes omitted).[6] Based on these findings, the juvenile court concluded:

39. Mother's absolute lack of participation to demonstrate her sobriety and stability in order to regain custody of [Children] leaves the Court doubtful that Mother is willing and able to fulfill her parental obligations to [Children].

40. Overall, Mother has failed to remedy the situation that brought about the removal of [C]hildren. Based on the pattern of behaviors and continuing pattern of substance abuse, child abandonment, and lack of stability, the Court finds that there is not a reasonable probability the situation which brought about the removal of [Children] is likely to be remedied. The Court finds that Mother's past behavior is the best predictor of her future behavior.

41. Further, Mother's behaviors during the underlying CHINS cases pose a threat to the well-being of [Children], including her lack of stability, her abandonment of [Children], and her continuing substance abuse. The risk of Mother continuing to use and relapse is very high, given Mother's past performance, and the Court is not willing to place [Children] back into a home where the caregiver is too intoxicated to provide [Children] with what they need to thrive. To allow the continuation of the parent

---

[6] Although the juvenile court entered three separate termination orders under separate cause numbers, the findings of fact and conclusions thereon are identical with respect to Mother. Accordingly, we quote only one order.

child relationship with Mother would pose a threat to the well-being of the [Children].

\* \* \*

47.     DCS and the [CASA] believe that adoption by the foster placement is in [Children]'s best interest [and they are] thriving in their care.  The Court finds that adoption by the foster placement is in [Children's] best interest.

48.     Mother's pattern of substance abuse, abandonment, and instability indicates that maintaining a parent-child relationship with Child[ren] is not in the best interests of Child[ren.]

*Id.* at 20-21.  Mother now appeals.[7]

# Discussion and Decision

## I.  Standard of Review

We begin by emphasizing that the right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution.  *In re D.D.,* 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied.*  The law provides for the termination of these rights when parents are

---

[7] Indiana Appellate Rule 9(F)(8)(a) requires that a copy of the appealed judgment or order be attached to the appellant's Notice of Appeal and Appellate Rule 46(A)(12) requires the same be submitted with the appellant's brief as a separate attachment.  Here, the appellant submitted what appears to be a *proposed* order on the involuntary termination of Mother's parental rights to this court rather than the juvenile court's order, in violation of this rule.  Although not raised by either party and copies of the appealed orders were included in the Appellant's Appendix, we take this opportunity to remind the parties to ensure that the correct documents are submitted to this court.

unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Although we acknowledge that the parent-child relationship is "one of the most valued relationships in our culture," we also recognize that "parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 147 (Ind. 2005) (internal quotations omitted). The involuntary termination of one's parental rights is the most extreme sanction a court can impose because termination severs all rights of a parent to his or her children. *See In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. As such, termination is intended as a last resort, available only when all other reasonable efforts have failed. *Id.* The purpose of terminating parental rights is to protect children, not to punish parents. *In re D.D.*, 804 N.E.2d at 265.

[16] When reviewing the termination of parental rights, we do not reweigh the evidence or judge the credibility of witnesses. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*. Instead, we consider only the evidence most favorable to the judgment and the reasonable inferences that can be drawn therefrom. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*, 534 U.S. 1161 (2002). Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[17] The juvenile court entered findings of fact and conclusions thereon as required by Indiana Code section 31-35-2-8(c), and we therefore apply a two-tiered standard of review. *Bester*, 839 N.E.2d at 147. We first determine whether the evidence supports the findings, then determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id*.

## II. Statutory Framework for Termination

[18] To terminate parental rights, Indiana Code section 31-35-2-4(b)(2) requires DCS to prove, in relevant part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the foregoing elements by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). However, because subsection (b)(2)(B) is written in the disjunctive the juvenile court need only find one of the three elements has been proven by clear and convincing evidence. *See, e.g., In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). If a juvenile court determines the allegations of the petition are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

# III. Findings of Fact

[19] As noted above, the juvenile court's judgment contains specific findings of fact and conclusions thereon. Therefore, we must first determine whether the record contains evidence supporting the findings either directly or by inference. *In re A.S.*, 17 N.E.3d 994, 1002 (Ind. Ct. App. 2014), *trans. denied*. Mother argues that many of the juvenile court's findings are clearly erroneous and she specifically challenges findings 13-14, 16-17, 19-21, 24-25, 29-41, and 48.

[20] With respect to findings 13, 16, 30, and 37, the juvenile court found that Mother failed to obtain and maintain appropriate and stable housing, employment, and financial stability during the pendency of the CHINS matter. Mother contends that these findings are clearly erroneous because the evidence reveals that she did have stable housing, employment, and financial stability at

the time of the fact-finding hearing. However, contrary to Mother's argument, we cannot conclude there is *no* evidence in the record to support these findings. The evidence establishes that, throughout this case, Mother had numerous jobs, was unemployed for several months, and at the time of the fact-finding hearing, had been working at a rehabilitation center in Tennessee for only six weeks. Mother never obtained stable housing of her own and has relied on others for housing throughout this matter. She admitted that she has been evicted seven times in the past and throughout this matter, she has lived with various individuals, including a friend, relatives, and most recently her boyfriend's parents in another state. Furthermore, Mother's recent bank statement was admitted into evidence and revealed a negative balance prior to a recent deposit. Given this evidence in the record supporting these findings, we find no error.

[21] Findings 17, 20, and 21 address Mother's compliance with the dispositional decree – finding that Mother failed to comply with all services and, even after DCS filed the termination petitions, Mother's compliance did not substantially improve. Mother argues these findings are erroneous because, at the time of the fact-finding hearing, she had been sober for nine months, recently participated in seven-week drug and alcohol program related to her DUI charge, and the FCM testified that she was complying with services and communicating with DCS regularly. Although Mother may have had a few brief periods of compliance, there is ample evidence in the record to support the juvenile court's findings.

[22] The undisputed evidence establishes that Mother completed two substance abuse assessments but never completed the recommended treatment. Further, she only met with the parent aide once before she stopped attending and was later discharged for non-attendance. Following Mother's acceptance and brief participation in the drug court program, she was discharged unsuccessfully from that program. At the fact-finding hearing, FCM Kathleen Parson testified that since Mother resumed drug screens in March 2019, Mother only consistently screened in June 2019. *See* Tr., Vol. II at 65.

[23] In findings 24, 25, and 29, the juvenile court found that Mother does not believe she has a substance abuse problem; her refusal to acknowledge her substance abuse issues make it more likely she will use; and she was not motivated by the removal of her Children to complete a substance abuse treatment program. Mother argues "[t]here is nothing in the record reflecting that [she] does not believe that she has a substance abuse problem[,]" there is no evidence to support the court's speculation with respect to her motives, and she completed a seven-week program and cooperated with DCS. Brief of Appellant at 18. We disagree.

[24] The evidence clearly establishes that Mother never attended substance abuse treatment. Although she completed a seven-week program, this is insufficient and not a substitute for the recommended substance abuse treatment. And further, the seven-week program was court-ordered due to Mother's recent DUI charge and completed with the goal of reducing or diverting the charge. Despite this, Mother testified that she does not consider herself to have a

drinking problem and she does not consider herself an addict anymore because she goes to work and no longer craves getting high. *See* Tr., Vol. II at 24. In fact, Mother stated that she understood that compliance with treatment would possibly lead to reunification with Children, yet she never sought treatment. We conclude the juvenile court's findings are reasonable interpretations of this evidence in the record, particularly given that the juvenile court weighs the evidence and is the sole judge of the witnesses' credibility. *See Lang*, 861 N.E.2d at 371.

[25] Findings 31-32 relate to Mother's failure to participate in the Parents Drug Court program and consistently submit to random drug screens. Mother argues these findings are clearly erroneous because "with the exception of a couple weeks in January, from October[] 2018 through the date of the trial, [she] regularly took drug screens, all of which were negative." Br. of Appellant at 20.

[26] FCM Kayla Bradshaw testified that she took over Mother's case in December 2017 and with respect to Mother's drug screens, Mother tested "either positive or dilute most of the time. She had one clean screen in January of 2018." Tr., Vol. II at 55. FCM Parson testified that Mother tested positive for alcohol in October 2018 and, on November 26, Mother admitted to using methamphetamine. Furthermore, Mother was charged with a DUI in April/May 2019. There is also ample evidence to support the finding that Mother failed to consistently submit to drug screens. Mother submitted to drug screens from November 2017 to January 2018, then disappeared for ten months. From October to November 2018, Mother submitted to screens but

then ceased all contact with DCS until February 2019. Parson testified that from March through May 2019, Mother missed five drug screens and Mother only consistently screened in June.

[27] Findings 33-36 concern Mother's visitation and Mother argues these findings are erroneous because although she *was* complying with services again in October 2018, DCS would not allow her to visit in the nine months before trial. She asserts that her "parental rights should not be terminated due to DCS's decision not to allow her to visit." Br. of Appellant at 20. Here, Mother merely provides a reason as to why she did not visit rather than explain why the juvenile court's finding is erroneous. Instead, the evidence reveals that at the outset of the case Mother participated in supervised visitation but stopped in January 2018 when she disappeared. At the fact-finding hearing, when asked why she stopped visiting with Children, Mother responded, "Because I took off." Tr., Vol. II at 27. She subsequently ceased all contact until October 2018 when DCS successfully located her. At that time, FCM Parson spoke with Mother and explained that in order to have visitation with the Children, Mother would have to comply with services "because it had been such a long period since she'd seen [them]." *Id.* at 60. Although Mother resumed services that same month, she was not fully compliant and again ceased all contact from December 2018 through February/March 2019. *See id.* The uncontroverted evidence establishes that Mother has not visited with her Children since January 2018 due to her own actions.

[28] Findings 14, 37, and 38 concern Mother's boyfriend. The juvenile court found that Mother's boyfriend is also a methamphetamine addict with a criminal history, and that Mother currently relies on his family for housing as she does not own or rent her own place. As such, the juvenile court found that "Mother's continued stability, at this time, is dependent on her relationship with [W.D.], another methamphetamine addict." Appellant's App., Vol. II at 20. Mother argues that these findings imply her boyfriend is unfit and "reflect the court's supposition that [her] stability is dependent on her relationship with her boyfriend, even though . . . she has been able to maintain sobriety for 9 months when she was both in and out of a relationship with him." Br. of Appellant at 20-21. Mother does not dispute her boyfriend's criminal history or that she currently lives with her boyfriend's family. Instead, Mother challenges the juvenile court's reasonable interpretation of these findings and asks this court to reweigh the evidence in her favor, which we cannot do. *See Lang*, 861 N.E.2d at 371. As such, these findings are not erroneous.

[29] Finally, Mother challenges findings 39 through 41 and 48. Although these findings are listed under Findings of Fact in the juvenile court's order, the substance of these are better characterized as conclusions of law, which we

address below. In sum, there is evidence in the record supporting the challenged findings and therefore, the findings are not clearly erroneous.[8]

# IV.  Conclusions of Law

## A.  Remedy of Conditions

[30] The juvenile court concluded there was a reasonable probability that the conditions that led to Children's removal and continued placement outside of Mother's care, namely Mother's substance abuse and instability, will not be remedied.

[31] We engage in a two-step analysis to determine whether such conditions will be remedied: "First, we must ascertain what conditions led to [Children's] placement and retention in foster care. Second, we determine whether there is a reasonable probability that those conditions will not be remedied." *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013) (quotation omitted). With respect to the second step, a juvenile court assesses whether a reasonable probability exists that the conditions justifying a child's removal or continued placement outside his parent's care will not be remedied by judging the parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Habitual conduct may include criminal history, drug and alcohol

---

[8] Mother contends Finding 19 is also clearly erroneous but fails to provide any argument as to why it is clearly erroneous. Therefore, Mother has waived appellate review of this issue. *See* Ind. Appellate Rule 46(A)(8)(a).

abuse, history of neglect, failure to provide support, and lack of adequate housing and employment, but the services offered to the parent and the parent's response to those services can also be evidence of whether conditions will be remedied. *A.D.S v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change." *In re I.A.,* 903 N.E.2d at 154.

[32]     Here, Children were initially removed from Mother's care due to her substance abuse issues. Children remained outside of Mother's care due to her non-compliance with services, continued substance abuse, and failure to complete substance abuse treatment. We conclude there is sufficient evidence to support the juvenile court's conclusion that a reasonable probability exists that these conditions will not be remedied.

[33]     First, Mother's participation in services was inconsistent and minimal at best. Mother was ordered to complete a substance abuse assessment and recommended treatment, participate in Parent Aide services, submit to random drug screens, and attend visitation. The parent aide services were ordered to assist Mother in obtaining stable housing and income. Mother met with the parent aide once and failed to attend any more meetings. At the fact-finding hearing, Mother stated she did not agree with the parent aide and "felt like [she] was able to do it on [her] own and didn't need the parent [aide]." Tr., Vol. II at 26.

[34]    Although Mother completed two substance abuse evaluations throughout this case, she never completed any recommended substance abuse treatment. Initially, Mother was accepted into the Parents Drug Court program; however, she failed to appear for a hearing less than one month into the program. The juvenile court issued a warrant for her arrest and she was later discharged for non-attendance. Following Mother's ten-month disappearance, she eventually completed another assessment in December 2018, which recommended that she participate in the Matrix program to address her substance abuse issues. Mother attended orientation but failed to attend any further appointments. As a result, services were closed out. Mother testified she had a scheduled appointment with Encompass Health and Recovery in Tennessee for another substance abuse assessment; however, as of the date of trial, Mother has never completed any substance abuse treatment.

[35]    Since the inception of this case, Mother's communication with DCS has been inconsistent and sporadic. At the fact-finding hearing, FCM Parson testified that when she was first assigned to this case in May 2018, Mother's communication was "non-existent[.]" *Id.* at 67. Then, from mid-October to December 2018, Mother maintained more regular contact with Parson but then ceased all contact until February 2019. And since February, Parson stated that contact has "been so-so" but described Mother's recent contact as the best or most consistent it has been since she first made contact with Mother. *Id.*

[36]    Similarly, Mother was inconsistent in submitting to drug screens. Mother began drug screens in late November 2017 and submitted to screens until

January 2018 when she ceased all contact with DCS until October 2018. From October to November, Mother resumed screens but again ceased contact with DCS from December 2018 through January 2019. Because there had been a lapse in the referral, DCS then put in a new referral and Mother began screening the first week of March. However, Mother was not consistent. From March through May 2019, Mother missed five drug screens and FCM Parson stated that Mother only consistently screened in June. And finally, with respect to visitation, FCM Bradshaw testified that Mother "did attend a few supervised visitations that the placement supervised . . . [b]ut then in January [2018,] she stopped attending visitations." *Id.* at 55. This was the last time Mother visited with Children.

[37] Second, Mother failed to maintain sobriety throughout this case. From the time of Children's removal in November 2017 through January 2018, Mother only had one clean screen. Mother then disappeared for approximately ten months during which time she stated she "got a touch of freedom" and admitted she was with her boyfriend using drugs. *Id.* at 37. After DCS located Mother in October 2018, Mother tested positive for alcohol and later, at a November 26 team meeting, Mother admitted to using methamphetamine with her boyfriend earlier that morning. In April or May 2019, just before the fact-finding hearing, Mother was charged with a DUI in Kentucky. When asked at trial whether she has maintained sobriety since Children's removal, Mother responded, "No, not till really now." *Id.* at 19.

FCM Parson testified that she did not believe Mother had remedied the conditions that led to Children's removal because Mother has not demonstrated long term sobriety or consistent housing. She stated, Mother "has only shown sobriety for one month out of the last four and she hasn't completed any kind of treatment. And the fear is that she would get stressed out or for some reason and fall back into her old patterns." *Id.* at 68.

Lastly, Mother has demonstrated a pattern of instability with respect to housing and income. At the fact-finding hearing, Mother disclosed that she has been evicted seven times. FCM Bradshaw testified that at the time of Children's removal, Mother's housing was in jeopardy. And throughout the pendency of this case, she has lived with various friends or family and has moved around. She lived with a friend in Evansville, her sister for several weeks, her brother in Mt. Vernon for approximately a month, and most recently, with her boyfriend's parents in Tennessee. Regarding employment, the evidence reveals that Mother has had a variety of jobs. From October to December 2018, Mother worked at a local bar and prior to that, she had worked at Royal Suites. Mother admitted she had a long period of unemployment from December 2018 to March 2019 but stated she had a $10,000 unclaimed check she used during that time. She then worked at Riverwalk Communities in Evansville for approximately one month and at the time of trial, she had been employed at Mission Dixon House and Rehabilitation in Tennessee for six weeks. Further, Mother's most recent bank statement was admitted into evidence at the fact-finding hearing and revealed a negative balance prior to a deposit. *See* Exhibit,

Vol. III at 22. In light of this evidence, the juvenile court found Mother's assertion that she is financially stable "less than credible[.]" Appellant's App., Vol. II at 14.

[40] This court has held that a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services demonstrates the requisite reasonable probability that the conditions will not change. *Lang*, 861 N.E.2d at 372. Such is the case here. Based on evidence of Mother's pattern of substance abuse, child abandonment, instability, and lack of participation in services, the juvenile court concluded, and we agree, that there is a reasonable probability that Mother will not remedy the conditions that led to Children's removal as her "past behavior is the best predictor of her future behavior." Appellant's App., Vol. II at 20. Mother argues that the juvenile court's order ignores her recent progress; however, the juvenile court was well within its discretion to "disregard the efforts Mother made only shortly before termination and to weigh more heavily Mother's history of conduct prior to those efforts." *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1234 (Ind. 2013); *see also Matter of C.M.*, 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997) (explaining that "it [is] within the province of the trial

court, as the finder of fact, to ignore or discredit . . . evidence" of a parent's remedial efforts made shortly before the termination hearing).[9]

## B. Best Interests

[41] "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). To determine the best interests of children, the juvenile court looks to the totality of the evidence and must subordinate the interests of the parents to those of the children. *In re D.D.*, 804 N.E.2d at 267. "A child's need for permanency is an important consideration in determining the best interests of a child[.]" *In re D.L.*, 814 N.E.2d 1022, 1030 (Ind. Ct. App. 2004), *trans. denied*. The juvenile court need not wait until a child is irreversibly harmed before terminating parental rights. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). Recommendations of the FCM and CASA, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interest. *In re A.S.*, 17 N.E.3d at 1005.

[42] In this case, FCM Parson and CASA Christopher Brown both testified that termination of Mother's parental rights is in the Children's best interests. *See*

---

[9] Mother also contends the juvenile court erred in finding that the continuation of the parent-child relationship poses a threat to the well-being of Children. Having concluded the evidence is sufficient to show a reasonable probability the conditions resulting in Children's continued placement outside of Mother's care will not be remedied, we need not consider whether the parent-child relationship poses a threat to Children's well-being. *See In re L.S.*, 717 N.E.2d at 209.

Tr., Vol. II at 67, 84. Parson testified that she has never felt comfortable recommending that Children be returned to Mother "[b]ecause [she] was not able to ensure that [Mother] would be clean and sober, that [Mother] had addressed her substance abuse issues. And until just recently that [Mother] had stable housing." *Id.* at 67. Parson further explained the importance of permanency for children in general, stating that it "gives them stability, lets them know that they have a safe place. That they have a place where they're wanted and loved." *Id.* at 66-67. Having concluded there is sufficient evidence to show the conditions that led to Children's removal and continued placement outside of Mother's care will not be remedied, this is sufficient evidence to support the juvenile court's conclusion that termination of Mother's parental rights is in Children's best interests. *See In re A.S.*, 17 N.E.3d at 1005.

# Conclusion

[43] DCS presented sufficient evidence to support the juvenile court's order terminating Mother's parental rights to Children. Therefore, the order was not clearly erroneous, and the judgment of the juvenile court is affirmed.

[44] Affirmed.

May, J., and Vaidik, J., concur.